NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

TROY THOMAS YORK, *Appellant*.

No. 1 CA-CR 20-0161
FILED 2-25-2021

Appeal from the Superior Court in Maricopa County
No. CR2018-115104-001
The Honorable Warren J. Granville, Judge (Retired)

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Eric Knobloch
*Counsel for Appellee*

Maricopa County Office of the Legal Advocate, Phoenix
By Michelle DeWaelsche
*Counsel for Appellant*

---

## MEMORANDUM DECISION

Judge Jennifer B. Campbell delivered the decision of the Court, in which Presiding Judge D. Steven Williams and Judge James B. Morse Jr. joined.

---

**C A M P B E L L**, Judge:

¶1 Troy Thomas York appeals his conviction and sentence for manslaughter. He challenges the superior court's jury instructions on both self-defense and the definition of a dangerous instrument. We reverse a conviction based on an erroneous jury instruction "only if the instructions, taken together, would have misled the jurors." *State v. Doerr*, 193 Ariz. 56, 65, ¶ 35 (1998). "Whe[n] the law is adequately covered by instructions as a whole," we uphold the jury's verdict. *Id.* York also alleges the prosecutor engaged in misconduct, that viewed in the aggregate, amounted to reversible error. For the following reasons, we affirm.

### BACKGROUND[1]

¶2 After shooting his brother in their shared home, York called 9-1-1 and requested emergency assistance. When officers arrived, they found the victim lying on the floor, unresponsive, with two gunshot wounds to the chest. Shortly after medical personnel transported the victim to a hospital, he was pronounced dead.

¶3 The State charged York with second-degree murder. At trial, York raised two justification defenses: self-defense and use of force in crime prevention. Because York never denied that he shot and killed the victim, the sole issue before the jury was whether his use of deadly force was justified under one or both asserted justification defenses.

¶4 York's alternative justification theories were predicated on the same factual basis: He testified that following a verbal dispute, the victim attacked him with a wooden chair. First, York claimed that he acted in self-defense: lawfully using deadly force to protect himself against the victim's use, or apparent, attempted, or threatened use, of unlawful deadly physical force. Second, he asserted that his conduct was justified to prevent

---

[1]   We view the facts in the light most favorable to sustaining the verdict. *State v. Payne*, 233 Ariz. 484, 509, ¶ 93 (2013).

the crime of assault with a dangerous instrument: lawfully stopping the victim from swinging, or threatening to swing, a chair with the intent to place York in reasonable apprehension of imminent physical injury.

¶5        At trial, officers testified that they observed no injuries on York, other than some red marks across his back, when they took him into custody. During the arrest, officers removed both a knife and pepper spray from York's belt.

¶6        Detectives who responded to the home testified that the scene did not match York's report to 9-1-1. There was no evidence of an altercation or disturbance in York's bedroom, the place York had identified as the point of origin of the altercation during his 9-1-1 call, and items that were precariously "stacked" in the bedroom entrance remained undisturbed.

¶7        To determine where the victim was standing when he was shot, a detective specializing in bloodstain-pattern analysis examined the blood evidence and concluded that the victim was shot while he was standing outside of York's bedroom door. The detective explained that the victim's "post-shooting movements" may have knocked over a chair, fan, and carpet box before he collapsed on the floor, but the bloodstain evidence was inconsistent with a scenario in which the victim was holding a chair over his head when he was shot.

¶8        Taking the stand in his own defense, York testified that the victim had been agitated the morning of the shooting and had argued with a neighbor. Afterward, the victim talked about the verbal altercation incessantly, so York told him to shut up.  Later that evening, York heard the victim yelling from the kitchen, "stop" and "get out." Fearing a possible intruder, York grabbed his revolver before checking on the victim.  Upon seeing no intruder, York asked the victim what had happened, and the victim mumbled something incoherent, appearing agitated. Having received no explanation, York told the victim to settle down or he would call the police.

¶9        At that point, according to York, the victim got a "crazy look on [his] face," grabbed a bottle of bleach, and threw it at him.  In an apparent rage, the victim then moved into the living room, lifted a chair, and began swinging it at York.

¶10        Upon being struck with the chair, York fell to the ground. Although he remained on the floor, the victim continued swinging the chair in his direction. To ward off another blow, York aimed his revolver and shot

the victim. When the bullet struck, the victim paused only momentarily, and then continued toward York. On the stand, York recounted that the victim had threatened to "rip [his] throat out" as he lunged toward him. Claiming he feared for his life, York testified that he shot his brother a second time.

¶11        After an eight-day trial, the jury acquitted York of second-degree murder but found him guilty of the lesser-included offense of manslaughter, based on the alternative theories that he (1) committed second-degree murder upon a sudden quarrel or heat of passion, or (2) recklessly killed the victim. The jurors were not required to unanimously agree on either theory to return a conviction for manslaughter. No aggravation phase was held, and the jurors were not asked to find whether the offense was dangerous. The superior court nonetheless sentenced York as a dangerous offender under A.R.S. § 13-704(L) to a mitigated term of seven years' imprisonment.

## DISCUSSION

### I.    Jury Instructions

¶12        York challenges the superior court's jury instructions on both self-defense and the definition of a dangerous instrument. Because York failed to object to the instructions at trial, he has forfeited the right to obtain appellate relief absent fundamental, prejudicial error. *State v. Escalante*, 245 Ariz. 135, 140, 142, ¶¶ 12, 21 (2018).

¶13        To establish fundamental error, a defendant first must prove the superior court committed error. Next, a defendant must show that such error (1) went to the foundation of the case, (2) took from the defendant a right essential to his defense, or (3) was so egregious that the defendant could not possibly have received a fair trial. *Id*. at 142, ¶ 21. "If the defendant establishes fundamental error under prongs one or two, he must make a separate showing of prejudice[.]" *Id*. To establish prejudice, a defendant must show "a reasonable jury could have plausibly and intelligently" reached a different verdict absent the error. *Id*. at 144, ¶ 31. Fundamental error occurs in "rare cases" and is "curable only via a new trial." *Id*. In applying the "could have" standard, we examine the entire record, including the parties' theories and arguments, as well as the evidence presented at trial. *Id*.

### A.     Self-Defense Instruction

¶14      The superior court granted York's request to instruct the jurors on both self-defense and use of force in crime prevention. Both defenses, if successful, would justify York's actions, rendering him not guilty of the charged offenses. In the final instructions, the self-defense instruction immediately preceded the crime-prevention instruction. The self-defense instruction primarily tracked the Revised Arizona Jury Instructions ("RAJI") Statutory Criminal Instruction 4.05 (5th ed. 2019), but the court omitted the final paragraph of the RAJI on self-defense, which shifts the burden of proof to the State:

> The State has the burden of proving beyond a reasonable doubt that the defendant did not act with such justification. If the State fails to carry this burden, then you must find the defendant not guilty of the charge.

The court's crime-prevention instruction followed RAJI 4.11. At the end of this instruction, the court included RAJI 4.11's burden-shifting paragraph, which is nearly identical to the burden-shifting paragraph the court omitted from the self-defense instruction:

> If evidence was presented that raised this justification defense, then the State has the burden of proving beyond a reasonable doubt that the defendant did not act with such justification. If the State fails to carry this burden, then you must find the defendant not guilty of the charge.

¶15      York does not challenge the crime-prevention instruction, nor does he argue the burden-shifting language the court gave was legally insufficient. Instead, he argues the superior court committed fundamental error by not specifically informing the jurors that the burden-shifting instruction applied to each justification defense. York points out that the burden-shifting paragraph at the conclusion of the crime-prevention instruction referred to "this justification defense," which he argues "may have" caused the jurors to misunderstand that the State also bore the burden of proof regarding his self-defense claim.

¶16      While there is no dispute that the jurors received the legally correct burden-shifting language, they were not specifically instructed that it applied to both justification defenses. Arguably, a juror may have interpreted the phrase "this justification defense" as referring solely to the crime-prevention defense, rendering the self-defense instruction ambiguous and legally deficient.

5

**¶17**      Counsel attempted to clarify the ambiguity in the instruction. *State v. Johnson*, 205 Ariz. 413, 417, ¶ 11 (App. 2013) (explaining appellate courts "consider [jury] instructions in context and in conjunction with the closing arguments of counsel" when evaluating their sufficiency); *State v. Bruggeman*, 161 Ariz. 508, 510 (App. 1989) ("Closing arguments of counsel may be taken into account when assessing the adequacy of jury instructions."). In closing argument, defense counsel explained the burden-of-proof allocation to the jurors:

> If evidence was presented that raised . . . these justification defenses, . . . [*t*]*he burden is on the State, the State then has the burden of proving beyond a reasonable doubt that the Defendant did not act with justification. If the State fails to carry this burden, that's it. You must find the Defendant not guilty of the charge. That's the law*. (Emphasis added.)

In rebuttal closing argument, the prosecutor stressed that "the State has the burden of proof. The State *always* has the burden of proof[.]" (Emphasis added.) Nonetheless, even with these attempts to clarify the shifting burden regarding self-defense, neither attorney ever directly stated that the burden-shifting instruction applied to both justification defenses.

**¶18**      As in *State v. Hunter*, the given instructions did not make clear that the State was required to disprove York's claim of self-defense if he provided evidence to support it. 142 Ariz. 88, 89–90 (1984) (concluding the given self-defense instruction constituted fundamental error because it was unclear that the State was required "to disprove beyond a reasonable doubt that [the defendant] acted in self-defense"). In *State v. Cannon*, 157 Ariz. 107, 107 (1988), the supreme court concluded the omission of a burden-shifting instruction entirely was not fundamental error because the jury had been instructed on the State's general burden of proof. In contrast, the jurors in York's trial were instructed that the State carried the burden to prove, beyond a reasonable doubt, that York's conduct was not justified, but only concerning the crime-prevention defense

**¶19**      Read in their entirety, we conclude the given instructions did not apprise the jury that the burden of proof shifted to the State if York presented evidence of self-defense. Because York has met his burden to show that the instructions were given in error, we must determine whether he has demonstrated resulting prejudice.

**¶20**      To establish prejudice, York only speculates that the jurors "may have" been confused about the shifting burden of proof regarding

self-defense. This assertion, however, is belied by the jury's finding that York was guilty of manslaughter. In reaching the manslaughter verdict, the jury necessarily rejected York's crime-prevention defense. In other words, to find York guilty of manslaughter, the jurors had to determine that the victim had not used the chair in a manner to commit an assault such that York's use of deadly force was justified.

¶21            Given the jurors' determination that the victim had not placed York even in *reasonable apprehension of physical injury*, they could not have reasonably concluded the victim committed a more severe act involving *deadly force*, as required to sustain the self-defense claim. Although York contends that the victim lunged at him while threatening to kill him, leaving him no choice but to fire the second shot, this explanation fails to recognize that by that point, York had already shot the victim. Based on the manslaughter verdict, the jurors did not accept York's claim that the victim was committing aggravated assault when York fired the initial shot. Because the jurors implicitly rejected York's justification defense of crime prevention, we are not persuaded that had they been properly instructed on the burden-shifting aspect of self-defense, they could have reasonably reached a different verdict.

### B.        Dangerous-Instrument Instruction

¶22            Next, York challenges the superior court's instruction that a "dangerous instrument is anything that could be used to cause death or serious physical injury." He argues the court erred by failing to include the additional, qualifying language found in A.R.S. § 13-105(12) and RAJI 1.0512: "under the circumstances in which it is used, attempted to be used, or threatened to be used." He asserts the absence of the additional language may have led the jurors to conclude that his crime-prevention defense failed merely because the jurors did not consider a chair a dangerous instrument.

¶23            Asserting he suffered no prejudice from the alleged error, the State argues that the given instruction inured to York's benefit because omitting the additional language made the definition less restrictive. In other words, under the given instruction, an object would always be a dangerous instrument if it *theoretically* could be used to cause death or serious physical injury, without regard to how the object was used in the given circumstance.

¶24            Assuming, without deciding, that the challenged instruction amounted to fundamental error, we discern no prejudice. The attorneys' closing arguments sufficiently clarified the definition of dangerous

instrument. *See Johnson*, 205 Ariz. at 417, ¶ 11. Contrary to York's assertion on appeal, defense counsel explained at length why the chair was a dangerous instrument:

> [T]hreatening to hit somebody with a heavy dining room chair is a crime. It's aggravated assault . . . it's assault with a dangerous instrument. Think of it as—as the same sort of assault as threatening or swinging a baseball bat at somebody. You can do serious damage, if not kill somebody with something—with an instrument like that in your hands.

Later, after reading the definition of dangerous instrument to the jurors, defense counsel continued:

> So that's pretty broad. Big rock could cause death or serious physical injury. A bat, one of these chairs over here. A monitor, if I'm swinging it at someone's head, could cause death or serious physical injury, lots of things. . . . [N]ot to beat this dead horse, but being hit with a dining room chair, like a baseball bat, or even a heavy enough nightstick, can break bones, crush skulls, smash faces, break windpipes, do all the things necessary to fit that definition.

¶25        The jury heard York's testimony—that the victim used a large wooden chair to knock him to the ground and nearly unconscious, and that the victim then continued to swing the chair while York was laying prone on the floor. York explained that he fired the first shot because he was afraid the victim would beat him to death with the chair. In addition, a detective also testified that a chair can be as lethal as a gun, depending on how it is used. Given this evidence, York has failed to show any prejudice from the asserted error. *See State v. James*, 231 Ariz. 490, 494, ¶ 15 (App. 2013) (explaining trial evidence is considered when assessing jury instructions).

¶26        In sum, had the jurors accepted York's account, the given instruction would not have compelled them to reject his crime-prevention defense. In fact, as the State suggests, the superior court's instruction made it *easier* for the jury to find the chair was a dangerous instrument. Under York's version of events, the way the victim allegedly wielded the chair clearly rendered it a potentially lethal weapon. Therefore, York has failed to establish that a reasonable jury could have reached a different verdict had the dangerous-instrument instruction included the additional language.

## II.    Alleged Prosecutorial Misconduct

**¶27**        York argues the State engaged in prosecutorial misconduct that deprived him of a fair trial. Specifically, he contends the prosecutor engaged in unduly argumentative cross-examination, impugned the integrity of defense counsel, and depicted him as a liar. Viewed in the aggregate, York argues the cumulative effect of the alleged misconduct amounted to a denial of due process. Because York did not raise a claim of prosecutorial misconduct at trial, we review only for fundamental, prejudicial error. *Escalante*, 245 Ariz. at 140, 142, ¶¶ 12, 21.

**¶28**        "We evaluate each instance of alleged prosecutorial misconduct to determine if error occurred and, if so, its effect." *State v. Goudeau*, 239 Ariz. 421, 465, ¶ 192 (2016). We then address the cumulative effect of any misconduct. *Id*. "The defendant must show that the offending statements were so pronounced and persistent that they permeate[d] the entire atmosphere of the trial and so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Gallardo*, 225 Ariz. 560, 568, ¶ 34 (2010) (internal quotations omitted). "To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that (1) misconduct is indeed present; and (2) a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying defendant a fair trial." *State v. Moody*, 208 Ariz. 424, 459, ¶ 145 (2004) (internal quotations omitted).

### A.    Cross-Examination of York

**¶29**        York first challenges the following questions and comments by the prosecutor during her cross-examination of him as unduly argumentative: (1) "There's not a question before you," when York began to offer an unprompted remark; (2) "Please let me finish my question," after York interrupted the prosecutor; (3) "It's just a yes or no question," cutting off York's expository response; (4) "I agree," following York's statement that he did not see himself in a photo of his bedroom taken by investigators; (5) "Did the bleach bottle grow legs after it was thrown?"; and (6) referring to York's account as a "story" and restricting his answer by stating he could offer further explanation on redirect examination.

**¶30**        Although the prosecutor vigorously cross-examined York, and the record reflects several combative exchanges, the questioning did not deny him a fair trial. *See State v. Bolton*, 182 Ariz. 290, 308 (1995) ("The questioning may have been argumentative. Nevertheless, the misconduct was not so egregious that it permeated the entire trial and probably affected

the outcome."[2]). As in *Bolton*, "the prosecutor here did not call defendant pejorative names, refer to matters not in evidence, suggest unfavorable matter for which no proof exists, or abuse defendant in any other way." 182 Ariz. at 308. Additionally, because the cited instances were brief and made during an isolated portion of a single day in a multiple-day trial, the comments did not sufficiently permeate the entire trial as to affect its outcome.

**¶31** York further protests the prosecutor's line of questioning that implied he was able to tailor his testimony to counter the State's case because he had reviewed the evidence before trial and listened to the trial testimony. He argues the prosecutor unconstitutionally "used the system of compulsory process against [him] to imply that because he received the evidence prior to trial and had an opportunity to 'think about' the case for a while, it 'helped his testimony' at trial."

**¶32** There is no due process violation when a prosecutor comments on the fact that a defendant had the opportunity to hear evidence and tailor his or her testimony accordingly. *Portuondo v. Agard*, 529 U.S. 61, 68–75 (2000). When defendants take the stand, their credibility may be impeached and their testimony challenged like that of any other witness. *Id*. at 69; *see, e.g., State v. Trammell*, 245 Ariz. 607, 609, ¶ 9 (App. 2018) ("[A] jury is free to weigh and assess witness credibility, which includes a testifying defendant's motivation."). Here, the prosecutor's series of questions permissibly sought to identify various gaps in the evidence that York explained to bolster his version of events. Consequently, York has shown no error, much less fundamental error, in the cross-examination.

### B. Comments in Rebuttal Closing Argument

**¶33** "Prosecutors have wide latitude in presenting their arguments to the jury[.]" *State v. Morris*, 215 Ariz. 324, 336, ¶ 51 (2007) (internal quotation omitted). "[D]uring closing arguments counsel may summarize the evidence, make submittals to the jury, urge the jury to draw reasonable inferences from the evidence, and suggest ultimate conclusions." *State v. Bible*, 175 Ariz. 549, 602 (1993). A prosecutor may not "improperly appeal to the jurors' emotions, passions, or prejudices by

---

[2]     In that case, the prosecutor's questions and remarks included: "And you expect the jury to believe this story, Mr. Bolton?"; "Stranger things have happened. You bet, Mr. Bolton."; and "So you are in a nice position here, we don't have any information with which to charge you with murder, do we?" *Id*. at 307–08.

urging them to convict [the] defendant for reasons wholly irrelevant to his own guilt or innocence." *State v. Herrera*, 174 Ariz. 387, 397 (1993) (internal quotations omitted). "While commentary about the defense's theory is common, [a]n argument that impugns the integrity or honesty of opposing counsel is . . . improper." *State v. Hulsey*, 243 Ariz. 367, 390, ¶ 99 (2018) (internal quotations omitted).

**¶34**        York cites the emphasized phrases in the following portion of the prosecutor's rebuttal closing argument to assert the prosecutor impermissibly depicted him as a liar:

> It's important to think about the way in which the defense was presented to you during the trial and today, and it fits pretty well with your jury instructions on what self-defense is. And it's interesting that when this was freshest, the day that it happened on 911, we hear him describing that his psychotic brother came after him. Those are the initial statements about this case.

> But then when the evidence didn't suggest that [the victim] had any mental health problems at all, he's not taking meds, he's not seeing a counselor, there's no evidence that [the victim] had any kind of mental health problem whatsoever in this trial. So then *his story evolves*, and we hear during opening statements about this intruder, and about the chairs.

> The story about the intruder is a *very manufactured detail* to try to explain the very significant fact that the Defendant has [a] gun in his hand in the first place. That's a *manufactured story by defense*. There's no evidence at all that an intruder ever was in this house or that [the victim] ever yelled about a hypothetical intruder being in the house. There's no evidence of that, other than *their story*.

> We also heard during trial about how after the Defendant hears that we're highlighting that these chairs sure don't look like they were recently broken, he says, "Oh, yeah, I've got that broken piece in the house right now," and he offers to bring it.

> Well, the State has the burden of proof. The State always has the burden of proof, but they're entitled to present evidence to help their case. And wouldn't he have brought that piece

of wood to help his case *if he really had access to it*? (Emphasis added.)

¶35        The challenged remarks permissibly criticized York's defense. York testified that he retrieved his revolver because he heard his "psychotic" brother yelling and he was concerned an intruder may have entered the house. This event purportedly led to the altercation that culminated in him shooting the victim. In rebuttal, the prosecutor argued the evidence, and the reasonable inferences drawn from it, undermined York's version of events. In doing so, the prosecutor urged the jurors to consider the fact that York did not tell the 9-1-1 operator many of the significant details presented at trial—such as his concern about the intruder and the victim attacking him with a chair. The prosecutor did not ask the jurors to convict York for reasons irrelevant to their determination of his guilt. *See State v. Jones*, 197 Ariz. 290, 305, ¶ 37 (2000); *Herrera*, 174 Ariz. at 397. Nor were the prosecutor's comments unduly inflammatory. *Herrera*, 174 Ariz. at 397.

¶36        York next contends the highlighted phrases below improperly impugned defense counsel's integrity and misstated the evidence:

> And then today during close[ing] arguments, defense counsel is saying that [the victim] didn't just say he was going to rip off [York's] face, or grab his face, or whatever it was. *Now we're hearing that* [the victim] *also lunged at him* as he's saying this, after he's been shot. Well, *that's a very convenient thing to say* after I have just explained and your instructions have just explained that words alone are not adequate provocation. Remember that *defense counsel's description of these events are not evidence*. (Emphasis added.)

¶37        First, we agree with York's contention that the prosecutor incorrectly implied there was no evidence to support defense counsel's argument that the victim "lunged" at York before he fired the second shot. *See supra* ¶ 10. We therefore construe the prosecutor's statements as merely a mistake or insignificant impropriety. *See State v. Price*, 111 Ariz. 197, 201 (1974) ("While there may have been some misstatements of fact they appear to be inadvertent and not of such magnitude as to be prejudicial."); *State v. Ramos*, 235 Ariz. 230, 238, ¶ 25 (App. 2014) ("Although some of the prosecutor's comments suggested that defense counsel was attempting to mislead the jury, we cannot say that those statements did more than criticize defense tactics.").

¶38　　　　Moreover, we presume the jurors followed the superior court's instructions that lawyers' comments are not evidence. *Morris*, 215 Ariz. at 336–37, ¶ 55. To the extent the prosecutor's comments misstated the evidence, the superior court's instructions "negated their effect," and no prejudice resulted. *Id.* at 337, ¶ 55. On this record, there is no reasonable likelihood the prosecutor's statements could have affected the jurors' verdict, particularly given that the jurors acquitted York of second-degree murder. *See State v. Stuard*, 176 Ariz. 589, 600 (1993) (noting the jurors' decision to acquit the defendant of certain charges "demonstrate[d] the jury's careful and proper consideration of the evidence"); *see also Moody*, 208 Ariz. at 459, ¶ 145.

¶39　　　　Despite her mischaracterization of defense counsel's argument, the prosecutor's remarks did not constitute personal attacks on defense counsel's integrity. *See State v. Amaya-Ruiz,* 166 Ariz. 152, 171–72 (1990) (finding a prosecutor's comments that defense counsel "blind sided" witnesses, used "innuendo and inference," made an "outrageous" argument, and accused witnesses were "not improper . . . and certainly did not rise to the level of fundamental error"). Instead, the comments, made during rebuttal argument, were intended to demonstrate weaknesses in the defense's case. We find no prosecutorial error in the State's rebuttal closing argument, let alone error that would violate due process.

¶40　　　　Finally, because we discern no prosecutorial misconduct in the individual allegations, we cannot find cumulative error. *State v. Bocharski*, 218 Ariz. 476, 492, ¶ 75 (2008) ("Absent any finding of misconduct, there can be no cumulative effect of misconduct sufficient to permeate the entire atmosphere of the trial with unfairness.").

## III.　Sentence Enhancement under A.R.S. § 13-704(L)

¶41　　　　Citing *Blakely v. Washington*, 542 U.S. 296 (2004), York argues the superior court illegally enhanced his sentence as a dangerous offender under A.R.S. § 13-704(L) because the jurors did not make a separate finding that the offense was dangerous. *See* A.R.S. § 13-105(13) (defining dangerous offense as an "offense involving the discharge, use or threatening exhibition of a deadly weapon or dangerous instrument or the intentional or knowing infliction of serious physical injury on another person"). Our review is again limited to fundamental, prejudicial error because York did not object to the enhancement of his sentence. *Escalante*, 245 Ariz. at 140, 142, ¶¶ 12, 21.

**¶42**        Generally, a jury must find whether an offense is dangerous. *State v. Larin*, 233 Ariz. 202, 212, ¶ 38 (App. 2013). "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Blakely*, 542 U.S. at 301 (internal quotation omitted). "[A] trial court's imposition of a sentence in violation of a defendant's right to a jury trial constitutes an illegal sentence and is therefore fundamental error." *State v. Johnson*, 210 Ariz. 438, 440, ¶ 8 (App. 2005). However, a separate jury finding is not required if the dangerous nature of an offense is inherent in the jury's verdict and "admitted or found by the trier of fact." A.R.S. § 13-704(L);[3] *see also State v. Anderson*, 177 Ariz. 381, 384 (App. 1993) ("The defendant's testimony can supply the requisite admission.").

**¶43**        On both direct and cross-examination, York repeatedly admitted that he shot the victim twice with his revolver. *See State v. Spratt*, 126 Ariz. 184, 186 (App. 1980) (stating a firearm is a deadly weapon "unless it is permanently inoperable"). Therefore, York's testimony established that he used a deadly weapon in committing the offense, and the superior court did not err by failing to submit the allegation of dangerousness to the jury. *See* A.R.S. § 13-704(L); *Anderson*, 177 Ariz. at 384.

**¶44**        Moreover, "*Blakely* error . . . can be harmless if no reasonable jury, on the basis of the evidence before it, could have failed to find [the factors] . . . necessary to expose the defendant to the sentence imposed." *State v. Hampton*, 213 Ariz. 167, 183, ¶ 72 (2006). Here, the uncontroverted evidence established that (1) York shot the victim with his revolver, and (2) the victim died from the gunshot wounds. York admitted he shot the victim to the 9-1-1 operator, confirmed that he shot the victim twice in his testimony, and a medical examiner testified that the victim died from the gunshot wounds. In fact, York's sole defense was that he was justified in shooting the victim. On these facts, no reasonable juror could have failed to find the offense was dangerous.

**¶45**        Accordingly, York has not carried his burden to establish fundamental error and resulting prejudice.

---

[3]        The parties agree, as do we, that dangerousness was not inherent in the offense of conviction.

**CONCLUSION**

¶**46**      For the foregoing reasons, we affirm York's conviction and sentence.



AMY M. WOOD • Clerk of the Court
FILED:   AA